## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**PRISON LEGAL NEWS, a project of the**
**Human Rights Defense Center,**

> **Plaintiff,**

**vs.**                                                  **No. 15 CV 107 JAP/KBM**

**COUNTY OF BERNALILLO,**
**PHILLIP GREER, Chief of Corrections,**
**in his official capacity,**
**RAMON RUSTIN, Former Chief of Corrections,**
**in his individual capacity,**
**DONALD VIGIL, Assistant Chief of Corrections,**
**in his individual and official capacity,**
**VIRGINIA CHAVEZ, Assistant Chief of Operations,**
**in her individual and official capacity,**
**TOM SWISSTACK, Deputy County Manager for Public Safety,**
**in his individual and official capacity, and**
**DOES 1-10, in their individual and official capacities,**

> **Defendants.**

## MEMORANDUM OPINION AND ORDER
## DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Prison Legal News (PLN), a project of the Human Rights Defense Center, seeks

a preliminary injunction ordering Defendants Bernalillo County, MDC Chief of Corrections

Phillip Greer, former MDC Chief of Corrections Ramon Rustin, Deputy Chief of Corrections

Donald Vigil, Assistant Chief of Operations Virginia Chavez, and Deputy County Manager for

Public Safety Tom Swisstack (County Defendants) to suspend enforcement of the mail policy at

the Metropolitan Detention Center (MDC) prohibiting inmates from receiving books sent

through the mail. *See* PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF UNDER THE

CIVIL RIGHTS ACT 42 U.S.C. § 1983 AND DAMAGES (Doc. No. 6) (Motion),

PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (Doc. No. 7) (Memorandum), and DECLARATION OF PAUL WRIGHT IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT 42 U.S.C. § 1983 AND DAMAGES (Doc. No. 8) (Wright Decl.).[1] The County Defendants oppose the Motion. *See* COUNTY DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Doc. No. 23). After an evidentiary hearing on March 30, 2015, PLN and the County Defendants filed supplemental briefs. *See* COUNTY DEFENDANTS' REPLY IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Doc. No. 34) and PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION (Doc. No. 35).

Applying the four-part test in *Turner v. Safely*, 482 U.S. 78 (1987), the Court will deny the Motion. County Defendants have met their burden of showing that (1) the MDC's policy prohibiting inmates from receiving books in the mail is related to legitimate penological objectives—security and safety. And, the other three *Turner* factors weigh in favor of MDC: (2) there are alternative means by which PLN can communicate with inmates; (3) there would be a negative impact on MDC personnel and other inmates if individual inmates were allowed to receive books through the mail; and (4) there is no ready, easy-to-implement alternative that would accommodate Plaintiff's desire to send books to individual inmates. Therefore, PLN has failed to demonstrate that it is substantially likely to prevail on the merits of its First Amendment claim. In addition, the Court will deny a preliminary injunction on PLN's Fourteenth

---

[1] In its COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER 42 U.S.C. § 1983 AND DAMAGES (Doc. No. 1), PLN asks the Court to "enjoin[ ] Defendants from unconstitutionally prohibiting delivery of books, including Plaintiff's books, to pre-trial detainees and other prisoners at [Metropolitan Detention Center]." (Mot. at 1.) PLN also asks the Court to order Defendants "to afford Plaintiff due process notice and an opportunity to challenge Defendant's censorship decisions." (*Id.*) PLN seeks declaratory and injunctive relief as well as nominal and punitive damages, attorneys' fees and costs.

Amendment due process claim under the unique facts of this case. Because MDC may constitutionally prohibit individual inmates at MDC from receiving books in the mail, MDC does not need to have a procedure by which PLN may appeal the rejection of each book. Hence, a preliminary injunction is inappropriate.

I.        BACKGROUND

    A.        THE MDC

The MDC is located near the city of Albuquerque, New Mexico. The MDC has a design capacity of 1950 inmates. Its inmate population consists of pre-trial detainees and inmates sentenced to less than one year of incarceration. Considered a mega-jail, the MDC is ranked 39th in size out of the 3300 jail facilities in the United States.[2] On average, 40,000 inmates are processed annually through the MDC.[3] For the last two decades, the MDC has been under the supervision of this Court in the *McClendon* class action lawsuit. *McClendon v. Bernalillo County et al.*, No. 95 CV 24 JP/KBM.[4]

    B.        PLN'S ALLEGATIONS

PLN is a wholly owned project of the non-profit Human Rights Defense Center. Paul Wright, founder of PLN, testified that the core of PLN's mission is public education, advocacy, and outreach to assist prisoners who seek legal redress for infringements of their constitutional and human rights. (Wright Decl. ¶ 2.) PLN distributes approximately 50 hard cover books on subjects of interest to prisoners. Some of the books are published by PLN, and some are published by others and distributed by PLN. (*Id.* ¶ 6.) The books contain information on legal issues related to confinement, prisoners' rights, safety, and health. (*Id.*) PLN also publishes and

---

[2] *See generally* Bernalillo County, http://www.bernco.gov/metropolitan-detention-center/ (last visited June 10, 2015).
[3] *Id.*
[4] A background summary of the *McClendon* lawsuit can be found in the MEMORANDUM OPINION AND ORDER DENYING MOTION FOR TRIAL ON THE MERITS, No. 95 CV 24 JP/KBM  (Doc. No. 1132) at 2–19.

distributes a monthly periodical with corrections and criminal justice news. (*Id.* ¶4.) Its periodical is distributed to over 2400 correctional institutions, including prison facilities in the New Mexico Correctional System. (*Id.*)

From June 2012 to the present, PLN mailed these hard cover books to various inmates at the MDC: (1) PROTECTING YOUR HEALTH & SAFETY (PYHS), by Robert E. Toone, published by the Southern Poverty Law Center; (2) Prisoner Diabetes Handbook, A Guide to Managing Diabetes—for Prisoners, by Prisoners (Diabetes Handbook) published by the Southern Poverty Law Center; and (3) THE HABEAS CITEBOOK: Ineffective Assistance of Counsel (Habeas Citebook), by Brandon Sample, published by PLN. Mr. Wright testified that from June 2012 to the present, the MDC has returned 43 copies of PYHS. (*Id.* ¶ 11.) In February 2013, the MDC returned one copy of the Diabetes Handbook. (*Id.* ¶ 12.) Since June 2014, the MDC has returned 40 copies of The Habeas Citebook. (*Id.* ¶ 10.) MDC mailroom employees labeled the returned books with notes stating "Return to Sender," "No Books," "No Cardboard" or "Unauthorized." (Wright Decl. ¶¶ 9, 11, 12.)

Most of the inmates were personally informed that books sent to them had been rejected. PLN was not formally notified of the MDC rejections and the reasons for the rejections, except by the returned packages themselves and the notations on those packages. (*Id.*¶¶ 9-12.) MDC has no process for PLN to appeal each rejection. (Wright Decl. ¶¶ 9, 13.)

After describing the educational content of each book, Mr. Wright asserts that there is no reasonable penological purpose behind rejection of PLN's books sent directly to inmates from PLN. (Wright Decl. ¶¶ 7, 10–12.) Mr. Wright submits that the books contain "invaluable information to prisoners to help them navigate the legal system, understand their constitutional rights, and/or educate prisoners on serious health issues related to their incarceration." (Wright

Decl. ¶ 14.) According to Mr. Wright, "[r]eading materials are key to ensuring that prisoners are engaged in a productive activity which helps avoid conflict and incidents of violence." (*Id.*)

PLN admits that none of the purported recipients at the MDC requested its books.[5] PLN explained that, as a general policy, it sends books unsolicited to detention center inmates who have been charged with serious felonies. PLN reaches out to prisoners that it determines have a need for the information because they are "likely to be going to prison." (Tr. 4:23–25; 10:25–26:2.) "All three books [rejected by the MDC] are regularly delivered to prisoners across the country, including prisoners housed in the Federal Bureau of Prisons system, the New Mexico Department of Corrections system, and in county jails across the nation." (Wright Decl. ¶ 13.) Mr. Wright "has never heard of any security incidents caused by receiving any of these books." (*Id.*)

PLN asserts that the MDC's blanket ban on books mailed directly to individual inmates violates PLN's First Amendment rights to free speech and expression without a rational basis for the prohibition. PLN further argues that the MDC violates PLN's due process rights under the Fourteenth Amendment because the MDC has no policy of providing PLN with formal notice and no policy allowing PLN appeal each rejection.

C.      THE MDC'S BOOK POLICY

The MDC's Policy 15.02 states: "Inmates may not receive packages, books, or third class mail of any type." Policy 15.03 states, "Inmates are not authorized to receive books through the mail. . . . Hardcover books or any other type of books are not allowed to be mailed in, even through the publisher." Policy 15.03 further states, "Packages and books are prohibited for receipt through the mail and will be returned unopened to sender. Packages and books are

---

[5] There was testimony at the hearing that one inmate may have requested a copy of the Diabetes Handbook. (Tr. 8:19–21.)

logged. The intended recipient will be notified." (*See* Def. Ex. F.) Inmates are allowed to receive other publications such as magazines, newspapers, periodicals, journals, and newsletters directly from the publisher. (*Id.*) Some inmates have received PLN's periodical newsletter. (Tr. 64:9–13.)

At the hearing, there was testimony that the MDC has an unwritten policy of allowing inmates to request permission from the MDC Chaplain to receive soft cover books; however, that policy is not well defined. (Tr. 51:25-53:6.) In the inmate handbook, however, inmates are told they cannot receive books of any kind in the mail from any source. (Tr. 57:1-10.) On the County's website, the public is informed that MDC inmates are not allowed to receive packages, and a phone number is provided for questions.[6]

For the past three and a half years, Manuel Romero, has monitored conditions and evaluated policies at the MDC as a court appointed expert in the *McClendon* class action.[7] To that end, Mr. Romero has helped MDC officials develop new policies and procedures in several areas. Mr. Romero has also worked with the New Mexico Association of Counties to develop "sample" policies for detention centers to help those facilities improve conditions in accordance with case law and best practices. Mr. Romero provided a copy of a sample mail policy to the MDC on February 10, 2015, and that sample policy was admitted into evidence at the hearing. (Tr. 39:21-24 Ex.C.) Mr. Romero gave the sample policy to the MDC in response to this lawsuit because "it provides the basis for them for a good policy." (Tr. 40:15-16.) Mr. Romero testified:

> Q. [Mr. Robles] So is it fair to say that your understanding as of this time is that MDC has taken the sample policy which you have given to them and is incorporating it into new revised mail procedure for MDC?
> A. That is my understanding.

---

[6] *See* Bernalillo County, http://www.bernco.gov/inmate-mail-4896 (Resp. Ex. E).
[7] In 2011, Mr. Romero was appointed by the Court as its expert under Fed. R. Evid. 706. Mr. Romero has worked extensively at the MDC to improve conditions and to amend the policies and procedures consistent with the U.S. Constitution and existing orders in the case. In the last several months, Mr. Romero has issued two reports on conditions at the MDC to assist the Court in determining whether MDC is compliant with existing consent decrees and orders.

(Tr. 41:7-11.) The sample policy provides a notice and appeal procedure for both the inmate and the sender of mail that is rejected. (Ex. C at pp. 8–9.) Also the sample policy allows inmates to receive soft cover books in the mail "directly from a publisher, distributor, or book club." (*Id.* at p. 7.) However, even under the sample policy, the MDC would have rejected PLN's hard cover books mailed to individual inmates.

Mr. Romero testified that the MDC Chaplain is responsible for screening books to "make sure they are okay for placement in the library." (Tr. 32:7–10.) Mr. Romero opined that the MDC's policy is "within the range of what [he sees] happening in other jail facilities throughout the country[.]" (Tr. 47:4–7.) However, Mr. Romero admitted he could not recall any facilities that had a complete ban on both soft and hard cover books sent directly from publishers. (Tr. 56:13–22.)

MDC's Policy 15.03 entitled "Publications for Inmates" was the subject of some confusing testimony regarding whether individual inmates can receive books through the MDC Chaplain. Policy 15.03 states in relevant part:

A. Permitted Volume of Printed Materials and Publications

　　1.  The number of reading materials permitted in a cell or dorm style bunk is two (2) per inmate. The limits set on books, magazines, newspapers, and periodicals, is based on safety/security and orderly operations, including fire safety and the fire code.

　　2.  Inmates are not authorized to receive books through the mail.

　　　a. The facility chaplain will accept a limited number of donated books, for inmates, which are educational or religious in nature. The books will be distributed equally throughout the facility after being approved by the chief of corrections.

　　　b. Educational books received through a program must have an authorization note from the facility chaplain if the number of books in a cell/sleeping area exceeds the total number of authorized publications.

. . .
    B.  <u>Receiving Printed Materials and Publications</u>

       1.  The mail clerk responsible for receiving mail shall return any printed materials and publications (i.e., magazines, newspapers, periodicals), which are unauthorized.

       2. Books will be automatically returned to sender.

(Resp. Ex. C.) Mr. Romero testified about the source of the reading materials allowed in 15.03

(A)(1):

       THE COURT: Let me ask you to comment in a general sense on your views about books generally being rejected under the stated policies and the somewhat conflicting information about procedures under 15.03(A)(1), where it refers to a limit set on books, magazines and periodicals? Are the books referred to in this procedure under 15.03 ones that come from what source? I'm not sure I understand.
       THE WITNESS:  To the best of my reading of this particular policy, Judge, is that **some of those materials that have come into an inmate through a publisher or through a vendor that they have a subscription to, and those are allowable.** But it could also be a book that has come in and then somebody has donated to the facility, and the chaplain has approved it for it to go into the different pods. So it could be disseminated that way. So it could be both through the mail and what the chaplain has received through donations.

(Tr. 60:19–61:9) (emphasis added). Despite this testimony, the Court finds that, under the

MDC's official policy, PLN may not mail its books directly to individual inmates at the MDC.

    Under the MDC's current policy, inmates may submit grievances regarding the rejection

of mail.  However, in a December 22, 2014 report to the Court in *McClendon*, Mr. Romero

opined that MDC security staff lack adequate responses "in addressing mail related inmate

grievances." (Def. Ex. A at 9.)

       1.     Security Concern

    MDC Deputy Chief of Security Donald Vigil testified that the MDC's current policy

serves "a number of important security and safety interests at MDC." (Vigil Aff. ¶ 7.) He also

explained how books that would be rejected if mailed directly to an MDC inmate may instead be

donated to MDC. (*Id.* ¶ 10.) Donated books on non-legal subjects are kept in collections located

in most of the MDC's housing pods, and legal books are placed in MDC's legal library. (*Id.*)

To highlight the security concerns presented by books mailed into the MDC, Deputy

Chief Vigil described the screening process for all books entering the MDC:

> First, a canine certified to detect narcotics examines each book individually.
> Next, a staff person must look at every single page of each book to ensure
> that no contraband such as drugs or weapons are [sic] contained in the book.
> A page-by-page examination by a staff member is also essential to ensure
> that the contents of the book itself have not been altered. . . . with writings on
> inappropriate topics such as weapons making or pornographic material. . . .
> [M]essages written on books can be used to coordinate criminal activity.
> After canine inspection and page-by-page inspection by staff, the books are
> examined by a [sic] X-ray machine in order to reveal any items hidden in the
> binding or spine of the book.

(*Id.* ¶¶ 11–17.)  Deputy Chief Vigil testified that the MDC prohibits books sent directly to

individual inmates to limit the amount of books that must be sent through this examination

process. "The process of examining books is time consuming and requires at least two staff

members including a canine handler and a staff member to review the book. . . . Depending on

the length of the book, this process can take anywhere from thirty minutes to an hour or more."

(*Id.* ¶¶ 18–20.)

Deputy Chief Vigil testified that books sent by publishers "must be subjected to this

process." (*Id.* ¶ 24.) "MDC staff cannot simply trust that the book came directly from the

publisher because the return address lists the publisher's address." (*Id.* ¶ 25.) Deputy Chief Vigil

testified that PLN's books would be welcome in the MDC library or in the book collections in

the housing pods. (Tr. 65:12–16; 69:1–11.)  However, Deputy Chief Vigil could not guarantee

that a certain inmate would be able to access a certain donated book. (Tr. 74:24–73:8.)

Deputy Chief Vigil admitted that if the PLN books were "broken down into separate

publications by chapter of different issues in a form that was just a pamphlet as opposed to a

book," the MDC would have no problem accepting the publications. (*Id.* 69:12–18.)  Hence, it appears that the MDC is most concerned with the binding and thickness of PLN's books and the associated risk of contraband "hidden in the binding or spine of the book." (Vigil Aff. ¶ 17.)

However, Deputy Chief Vigil admitted that Bibles are available to every inmate at MDC:

Q. Bibles are allowed to be possessed by the prisoners at the jail in their own cells. Isn't that correct?
A. That is correct.
Q. And the Bible is a very thick book, correct?
A. Yes.
Q. And the binding of the Bible could be used to secrete (sic) or hide contraband?
A. The majority of the bibles are little pocketbook bibles.
Q. But the bigger ones could be used to hide contraband?
A. Yeah. I haven't seen any of those. I've just seen the pocket ones.

(Tr. 74:1–11.) Deputy Chief Vigil testified that the MDC periodically searches for contraband in cells. (*Id.* 74:12–15.)

### 2.    Fire Safety Concern

Under the current MDC policy, each inmate is allowed to keep two pieces of reading material in the cell. (Vigil Aff. ¶ 30.) This policy is based on "fire safety considerations." (Vigil Aff. ¶ 31.) "Allowing inmates to keep a large amount of items in their cells may impede inmates' ability to leave the cell in the event of an emergency." (*Id.* at 32.)

### 3.    Storage Concern

Deputy Chief Vigil testified that the MDC is a short-term facility with a high turnover rate and that the MDC has very limited space to store each inmate's personal property. If inmates were allowed to receive hard cover books individually as personal property, the MDC would have insufficient space to store books in excess of the two allowed in each inmate's cell. (Tr. 65:21–66:8.) Securely storing extra books would "impose an undue burden [on the MDC]." (*Id.* 66:4.)

D.      LIBRARIES AT THE MDC

The MDC has one legal library. The MDC states that it maintains a library for non-legal

material in each of the more than two dozen housing dormitories or "pods." The books in these

libraries are predominately fiction books and are stored on a cart or a shelf in each pod's

"program room." The books are available to all inmates in the pod; however, there is no formal

process for inmates to "check out" books. Moreover, Deputy Chief Vigil could not verify that all

pods have a library. (Tr. 71:11–24.)

The MDC accepts donated books through its Chaplain, who approves and places donated

materials in either the legal library or the pod libraries. (*Id.* 72:4-8.) MDC's captains and

supervisors "rotate the books from each pod, each housing unit, [but] that's not formalized . . ."

(*Id.* 72:10–13.) Notably, if PLN had donated to the MDC the books it mailed directly to inmates,

the books would have been accepted into the pod collections or the legal library after screening.

(Tr. 65:12–20.) As mentioned, the MDC cannot ensure that a particular inmate will have access

to a particular donated book:

> Q. Is it your experience that prisoners that are stronger and the most physically fit
> will dominate a pod?
> A. That happens. But I've also been—throughout my over 25 years in corrections,
> I've seen that, you know, you have those dominant; but it's kind of dwindled
> away to where once it's read, they share the book with everyone.

(*Id.* 73:13–18.)

II.     LEGAL STANDARDS

A.      PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, a movant must establish: (1) that it has a substantial

likelihood of prevailing on the merits; (2) that it will suffer irreparable injury if the injunction is

denied; (3) that the threatened injury to the movant outweighs the injury that the opposing party

will suffer under the injunction; and (4) that the injunction would not be adverse to the public interest. *Utah Licensed Beverage Assn. v. Leavitt*, 256 F.3d 1061, 1065-66 (10th Cir. 2001).

The Tenth Circuit has identified three types of disfavored preliminary injunctions and has concluded that a movant must "satisfy an even heavier burden of showing that the four [preliminary injunction] factors . . . weigh . . . in movant's favor before such an injunction may be issued": (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975–76 (10th Cir. 2004). The preliminary injunction requested here fits into one or more of these disfavored categories, and the Court must closely scrutinize the basis for a preliminary injunction "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* Hence, PLN "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.*

B.    FIRST AMENDMENT RIGHTS IN DETENTION CENTERS

Inmates have a First Amendment right to receive information while in prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison. *Jacklovich v. Simmons*, 420 F.3d 392, 426 (10th Cir. 2004) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Moreover, "there is no question that publishers who wish to communicate with those who willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott,* 490 U.S. 410, 408 (1987). In weighing the First Amendment interests against the deference afforded corrections officials, the reasonableness of the regulations and policies is the primary concern. *Jacklovich*, 420 F.3d at 426 (citing

12

*Thornburgh* 490 U.S. at 414). When a prison regulation impinges on inmates' or publishers' constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests." *Thornburgh,* 482 U.S. at 414 (quoting *Turner*, 482 U.S. at 89). In making this determination, the Court is guided by four factors outlined in *Turner*.

"'First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.'" *Jones v. Salt Lake County*, 503 F.3d 1147, 1153 (10th Cir. 2007) (quoting *Turner*, 482 U.S. at 89). "The legitimate governmental objective must also be neutral." *Id.* A regulation restricting an inmate's First Amendment rights must operate without regard to the content of the expression. *Id.* Where a regulation furthers an important governmental interest unrelated to the suppression of expression, the neutrality requirement is met. *Id.* If officials draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are considered neutral. *Id.* (citing *Thornburgh*, 490 U.S. at 415–16).

Second, the Court asks whether there are alternative means of exercising that constitutional right that remain available to inmates. *Jones*, 503 F.3d at 1153 (citing *Turner*, 482 U.S. at 90). "'Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation.'" *Id.* (quoting *Turner*, 482 U.S. at 90). The "alternatives 'need not be ideal; they need only be available.'" *Id.* (quoting *Wardell v. Duncan*, 470 F.3d 954, 961 (10th Cir. 2006)).

Third, the Court must examine the impact accommodation of the asserted right would have on guards, other inmates, and prison resources. *Jones*, 503 F.3d at 1153 (citing *Turner*, 482 U.S. at 90).

> In the necessarily closed environment of the correctional institution, few changes
> will have no ramifications on the liberty of others or on the use of the prison's
> limited resources for preserving institutional order. When accommodation of an
> asserted right will have a significant ripple effect on fellow inmates or on prison
> staff, courts should be particularly deferential to the informed discretion of
> corrections officials.

*Id.* (quoting *Turner*, 482 U.S. at 90).

Finally, the Court determines whether an obvious, easy alternative means of accommodating the right exists at *de minimis* cost to valid penological interests. If so, the regulation may not be a reasonable but an "exaggerated response" to prison concerns. *Id.* at 1154 (quoting *Thornburgh*, 490 U.S. at 418).

"[T]he first *Turner* factor is actually more of an 'element' than a factor in the sense that it 'is not simply a consideration to be weighed but rather an essential requirement.'" *Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007) (citation omitted). Although the burden is on the Plaintiff to disprove the validity of a prison regulation, "[t]o satisfy the first *Turner* factor, 'the prison administration is required to make a minimal showing that a rational relationship exists between the policy and stated goals.'" *Id.* (quotation omitted). "Space, health and safety are legitimate and neutral penological interests . . ." *Jones*, 503 F.3d at 1153.

Once defendants have met the first prong, however, a plaintiff must meet a high standard to establish that the other *Turner* factors weigh in the plaintiff's favor. *Id.* at 1159–60. In other words, once the first factor is met, plaintiffs must prove the existence of alternatives that accommodate inmates' rights at a *de minimis* cost to the facility. *Id.*

In applying *Turner's* "reasonable basis" test, courts must give appropriate deference to the expertise of prison authorities. *Hammons v. Safle*, 348 F.3d 1250, 1255 (10th Cir. 2003) (citing *Turner,* 482 U.S. at 84). However, "a reasonableness standard is not toothless" and deference is not a rubber stamp; thus, before acceding to the judgment and discretion of prison

14

administrators, a court should have evidence that their judgment and discretion have been exercised." *Id.* (citing *Thornburgh*, 490 U.S. at 414).

### C.     PUBLISHERS' DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT

In *Procunier v. Martinez*, the Court recognized that both inmates and correspondents have a qualified liberty interest in uncensored communications that are protected by the First Amendment. 416 U.S. 396, 418 (1974) *overruled on other grounds by Thornburgh*, 490 U.S. 401 (1989). The Supreme Court in *Martinez* upheld a district court requirement "that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of the letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." *Id.*

Other courts have recognized that both inmates and publishers have a right to procedural due process when publications are rejected. *Jacklovich*, 392 F.3d at 433 (citing *Prison Legal News v. Cook*, 238 F.3d 1145, 1152–53 (9th Cir. 2001)). Thus, publishers are entitled to notice and an opportunity to be heard when their publications are rejected. *Id.* (citing *Montcalm Publishing Co. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996)).

## III.    DISCUSSION

### A.     PLN'S FIRST AMENDMENT CLAIM

In *Thornburgh* the Supreme Court noted that "publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." 490 U.S. at 408. The County Defendants argue that *Thornburgh's* phrase "through subscription" and the reference to inmates who "willingly seek their point of view," means that PLN has no First Amendment right to communicate with MDC inmates who have not asked for its publications. The County Defendants also point to *Prison*

*Legal News v. Cheshire*, No. 1:04CV173DAK, 2006 WL 1868307 (D. Utah June 30, 2006)

(unpublished) as persuasive authority for this contention. However, *Cheshire* stands for no such

proposition. In that case, the court rejected an argument by jail officials that PLN had no

standing to claim its First Amendment rights had been violated because PLN sent inmates

samples of its monthly publication as a way to solicit subscriptions from those inmates. *Id.* at *3–

5.

> The issue is the alleged injury to Plaintiff's constitutional rights. . . . Plaintiff's
> claims that its constitutional rights have been harmed by the Jail's policy
> precluding individual inmate subscriptions could be redressed by this court if this
> court were to declare the Jail's policy unconstitutional. Therefore, the court finds
> that Plaintiff has standing to pursue its claims.

*Id.* at *4.[8] Hence, the *Cheshire* holding does not support the County Defendants' contention that

publishers have no First Amendment right to communicate with non-subscribers.

PLN points to *Hrdlicka v. Reniff,* 631 F.3d 1044 (9th Cir. 2010), which held that "[a]

First Amendment interest in distributing and receiving information does not depend on a

recipient's prior request for that information." *Id.* at 1049. PLN also relies on a decision by the

Fifth Circuit Court of Appeals recognizing a publisher's right to send unsolicited publications to

inmates. In *Prison Legal News v. Livingston*, 683 F.3d 201, 207 (5th Cir. 2012), PLN challenged

Texas prison system's decision to ban five of its books sent to inmates. *Id.* at 207. The district

court dismissed PLN's claims as to two of the books because no prisoner had ordered those

books. The Fifth Circuit reversed: "[P]risoners and those 'reaching out' to them enjoy generally-

---

[8] As pointed out by the County Defendants, the court focused on the evidence that no inmate had requested PLN's
publication to find that PLN had no Fourteenth Amendment right to notice and an opportunity to appeal:

> The case law regarding a publisher's due process interests all refer to a publishers (sic)
> communications and access to inmate subscribers. . . . The court refuses to extend the current state
> of case law to provide due process protections to publishers soliciting subscriptions. . . .The court
> finds that there is no reason to extend the current due process protections available to publishers
> who have inmate subscribers to publishers seeking to gain subscribers.

*Id.* at *9.

existing constitutional rights unless those rights interfere with prison regulations reasonably related to legitimate penological interests." *Id.* at 214. The Court finds *Hrdlicka* and *Livingston* persuasive and concludes that PLN has a First Amendment right to communicate with inmates at the MDC whether or not inmates have requested PLN's publications. Thus, the Court proceeds to the *Turner* factors.

        1.      FIRST FACTOR: LEGITIMATE PENOLOGICAL OBJECTIVE

        a.      Security Concern

PLN argues that the maintenance of safety, security, and discipline does not justify the MDC's wholesale prohibition of its books. PLN argues that the content of its books does not pose any threat to legitimate penological goals. The Court agrees. The content of the books appears to be educational on important correctional issues. However, the MDC is not concerned with the content, but the form, of the books. On that issue, PLN maintains it has never been accused of attempting to smuggle contraband in its mailings, therefore, MDC officials do not have to screen its packages as carefully.

Deputy Chief Vigil testified that each book entering the MDC must be screened by a canine handler to detect drugs, by a page screener for dangerous added content, and by an X-ray scanner for weapons. And due to the risk that individuals may pose as publishers, all books, regardless of source, must be carefully screened. The County Defendants cite the size of the MDC as another reason it cannot allow individual inmates to receive books in the mail without overly burdening the MDC's screening apparatus. The County Defendants maintain that allowing inmates to receive books in the mail, even from publishers, would require the MDC to incur the cost of many more worker hours. The Court does not doubt PLN's contention that it has never been accused of sending contraband. However, PLN has not countered the evidence that

there is a real threat that individuals posing as publishers may attempt to smuggle in contraband or inappropriate content. PLN does not persuade the Court that the MDC's process of screening all books is irrational.

In its supplemental brief, PLN included a recent case in this district in which United States Magistrate Judge Gregory B. Wormuth recommended striking down a similar rule at the Dona Ana County Detention Center (DACDC). *White v. Dona Ana County Detention Center*, No. 08 CV 955 WJ/GBW, PROPOSED FINDINGS AND RECOMMENDED DISPOSITION (Doc. No. 138) (Jan. 12, 2011) (PFRD).[9]

The *White* case involved, *inter alia*, the DACDC's rejection of a book mailed to the plaintiff entitled "The Jailhouse Lawyer's Handbook" from The Center for Constitutional Rights, under the DACDC's policy prohibiting all inmates from receiving "publications, magazines, or books" in the mail. *Id.* at 4, 15. The DACDC justified its rejection with a general "security reason[]" for the policy, the "small amount of space available for inmates to store this material," and "the amount of mail received by that facility." *Id.* at 15–16. Finally, a DACDC official testified that the facility does not allow books because "drugs and shanks can be hidden in books and then smuggled into the facility." *Id.* at 16. The Magistrate Judge found that despite DACDC's legitimate security concern related to smuggling, the second, third, and fourth *Turner* factors weighed in favor of the plaintiff. *Id.* The Magistrate Judge noted as to the second factor that the "push cart library is not a meaningful alternative for obtaining books of one's own choosing." *Id.* With respect to the third and fourth factors, the Magistrate Judge favored plaintiff's proposal of a publisher only rule, because those packages "never had the opportunity to be tampered with by a third party" and, as such, the receipt of those books "did not pose a

---

[9] There is no order on the docket from the district court judge adopting the PFRD. On June 14, 2011, District Judge William P. "Chip" Johnson granted a joint motion to dismiss the defendants who were the subject the PFRD. *See* ORDER ON JOINT MOTION TO DISMISS (Doc. No. 151).

smuggling risk, and allowing them in will not significantly burden the detention center." *Id.* at

16–17. The Magistrate Judge minimized the DACDC's storage problem: "to accept books

mailed from publishers is not the same thing as requiring DACDC to allow its detainees to amass

their own personal library." *Id.* at 17. Thus, the Magistrate Judge concluded that the plaintiff had

presented a valid alternative that preserves an important right that "would not unduly burden jail

resources." *Id.* (citing *Jones*, 503 F.3d at 1160).

The MDC's policy, while similar to the DADCD's policy, differs in significant ways.

The MDC allows inmates to receive magazines and newspapers in the mail. And more

importantly, the MDC provides evidentiary support for its requirement that all books be carefully

screened. The MDC, unlike the DACDC, has come forward with evidence regarding the danger

that senders, posing as publishers, may attempt to smuggle in contraband..

The Tenth Circuit has recognized that hardback books present an "obvious security

problem" because they can be used to "smuggle contraband . . . and are hard to search

effectively." *Jones*, 503 F.3d at 1157(accepting as persuasive jail's argument that hardback

books present an administrative burden on staff to "carefully inspect each book.") (citing *Bell*,

441 U.S. at 550). Hence, MDC has shown a rational connection between its prohibition of

hardback books sent to inmates and legitimate security concerns related to smuggling.

PLN points to a Tenth Circuit case striking down a ban on publications. In *Jacklovich,*

PLN and an inmate challenged three regulations of the Kansas prison system (KDOC): (1) a ban

on the receipt of gift publications, (2) a dollar limit on publication purchases, and (3) a ban on

some inmates' receipt of any publications. 392 F.3d at 428. The Tenth Circuit concluded that

there were genuine issues of material fact on all four *Turner* factors. *Id.* The plaintiffs' expert

opined that KDOC's policies served no legitimate penological purpose because the defendants'

behavior management rationale for the regulations was not sufficiently supported. *Id.* In addition, the defendants' rationale of discouraging gift subscriptions due to the threat of "strong arming" was disputed. *Id.* The plaintiffs' expert opined that strong arming would more likely occur with items purchased from the canteen and pointed out the inconsistent policy of allowing money orders to be deposited into prisoner's accounts without knowing the source of the funds leaving a wide gap in KDOC's effort to avoid strong arming. *Id.*

On remand, the district court held a bench trial and ruled that KDOC failed to prove there was a rational and valid connection between the regulations and security concerns. *See Prison Legal News v. Werholtz*, No. Civ. 02-4054-MLB, 2007 WL 2875113 (D. Kan. Oct.1, 2007) (unpublished). The court was troubled primarily by the inconsistency of the proffered rationales for KDOC's policy. *Id.* at *3. First, the court found there was no evidence that lifting the ban and limits on the receipt of publications would result in extortion, strong arming, debt collection, or trafficking. *Id.* In addition, the court found that KDOC failed to establish how the regulations meaningfully advanced its privilege and incentive system. *Id.* *4. Finally, the court concluded that KDOC failed to demonstrate a rational and valid connection between the limit on spending for publications and the risk that inmates would avoid other financial obligations. *Id.*

This case differs from *Jacklovich* and *Werholtz* because the MDC houses inmates and detainees for a significantly shorter time period and there is a high inmate turnover rate at the MDC. *See Bell v. Wolfish*, 441 U.S. at 551–52 (considering the brief terms of confinement for most inmates as important in its decision to uphold a publisher-only rule); *Jones*, 503 F.3d at 1157 (upholding jail's general prohibition on inmates' receipt of paperback books in the mail); *Cheshire*, 2006 WL 1868307, *6 (upholding a prohibition on individual subscriptions to PLN's newsletter and finding as a critical fact, the short stays of inmates at jail and the transitory nature

of the jail's population) (unpublished).  In *Werholtz*, the defendants failed to establish a rational and valid connection between the regulations and security concerns, the use of an incentive system, and the policy of encouraging inmates to meet their financial obligations. 2007 WL 2875113, *4. Here, the County Defendants have come forward with evidence that MDC's prohibition of books mailed to individual MDC inmates significantly aids in the legitimate concern of preventing contraband from being smuggled into the facility. Hence, the County Defendants have met the burden of showing a rational connection between the MDC's policy and legitimate security concerns.

b.     Fire Safety Concern

Deputy Chief Vigil testified that the MDC is also concerned about the fire hazard presented by too much paper in the cells as a justification for its policy. PLN points to a case in the Tenth Circuit rejecting the fire safety rationale. In *Thomas v. Leslie*, the plaintiff alleged that the ban on newspapers at the Reno County, Kansas jail violated his First Amendment rights. Nos. 97-3346, 97-3361, 1999 WL 281416 (10th Cir. Apr. 21, 1999) (unpublished). The Tenth Circuit agreed with the district court that the absolute ban on newspapers while allowing paperback books did not have a "'valid, rational connection' . . . [to] the legitimate governmental interest put forth to justify it," particularly where the fire hazards could as well be caused by the permitted reading materials. *Id.* at *7. Similarly, the County Defendants have failed to prove that the prohibition on books mailed to individual inmates furthers their fire safety rationale since other paper publications are allowed in the cells, and the limit of two publications per cell addresses this concern.

c.      Storage concern

Like the fire prevention concern, the storage concern is not as compelling as the security concern. The storage problems associated with books are not much different than the storage problems associated with magazines and newspapers belonging to individual inmates. Hence, the storage concerns proffered by the MDC do not provide a convincing rationale for prohibiting books.

Despite the weakness of the fire and storage concerns, the Court, at this juncture, is especially mindful of the need to afford "deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Thornburgh,* 490 U.S. at 407–08. The County Defendants have presented sufficient evidence that the security concern, necessitating careful screening of each book, is a legitimate reason for its policy of prohibiting books mailed directly to individual inmates. Thus, the need to lower the risk of contraband entering the MDC is rationally connected to the MDC's security concerns, and prohibiting books, which take more time to screen, but allowing other publications, which require less time to screen, reasonably addresses that concern, while allowing inmates to receive communications from the outside world.

2.      SECOND FACTOR: ALTERNATIVE MEANS OF EXERCISING FIRST AMENDMENT RIGHTS

The second *Turner* factor is whether PLN has alternative means of exercising its right to communicate with inmates. *Turner*, 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Id.* Deputy Chief Vigil and Mr. Romero testified that MDC inmates have access to books and publications in the housing pod libraries. On cross examination, both admitted the maintenance

and availability of publications in some housing pods is inadequate or non-existent. And there is no process by which inmates can "check out" materials from the pods that have libraries. However, it is worth noting that according to Deputy Chief Vigil and Mr. Romero, if PLN had donated the 80+ books to the MDC instead of mailing them to individual inmates, those books would have been accepted and placed in the pod libraries. The County Defendants presented evidence that sending books to inmates directly would impose an ongoing undue burden on MDC personnel to carefully screen each book. The extra screening would require extra worker hours.

Although there certainly is room for improvement in the availability of publications in the MDC's housing pods, PLN has failed to convince the Court it has no alternative means to communicate with MDC inmates. PLN may donate its books to MDC. Moreover, inmates at the MDC currently have access to PLN's periodical publications, which contain valuable educational information on inmates' rights.

3.     THIRD FACTOR: IMPACT ON FACILITY

The third *Turner* factor requires PLN to show that if it were allowed to mail books directly to individual inmates, there would be no significant impact  on guards, other inmates, and the allocation of the MDC's resources. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner* 482 U.S. at 90. The County Defendants outlined the impact in terms of worker hours that would have to be expended on the screening of books sent to individual inmates. Deputy Chief Vigil testified that screening each book can take from thirty minutes to an hour of time and involves at least two workers: a canine handler and a page screener. If all inmates could receive books in the mail, then

23

potentially hundreds of books could enter into the facility. This would result in a corresponding significant increase in worker hours devoted to screening.

The County Defendants presented evidence that inmates who exceed the limit of two publications in their cells would need to store those extra materials in a secure place. The MDC contends that its storage area would be insufficient to handle the extra property. Unlike a long-term prison facility, the MDC's population has a high turnover rate. The evidence showed that most inmates stay less than a year, and many are bonded out or released on conditions in a much shorter time period. PLN asserts that some inmates are incarcerated for significantly longer than a year. For example, PLN's counsel presented information through cross examination of one of the County Defendants' witnesses, that one inmate, W.G., had been at MDC for more than 3 years. However, PLN failed to refute MDC's evidence that the vast majority of inmates are housed at MDC for much shorter times. Thus, PLN has failed to show that a preliminary injunction would not have a significant impact on the MDC's resources and personnel.

4.    FOURTH FACTOR: ABSENCE OF READY ALTERNATIVES FOR EXERCISE OF FIRST AMENDMENT RIGHTS

The fourth *Turner* factor requires PLN to show that obvious, easy alternatives exist that fully accommodate PLN's rights at *de minimis* cost to valid penological interests such that the regulation at issue is an exaggerated response to those interests. *Prison Legal News v. Chapman*, Civ. No. 3:12-CV-00125 (CAR), 2013 WL 1296367, *5 (M.D. Ga. Mar. 26, 2012) (unpublished). PLN offers as an alternative, the well-known "publishers only" rule. In other words, PLN proposes that the MDC accept all books mailed to inmates by publishers. But, PLN has not proffered evidence that this alternative could be implemented at a *de minimis* cost to the MDC. Based on the evidence, it appears that PLN's alternative would cause the County Defendants to incur significant costs, both in worker hours and in increased risk to the inmate

24

population and employees. Therefore, PLN has failed to carry its burden under the fourth *Turner* factor. *Chapman*, 2013 WL 1296367, *5 (ruling that PLN failed to prove fourth factor that jail could alter its postcard only policy with only *de minimis* cost).

### 5.   PRELIMINARY INJUNCTION WILL BE DENIED ON FIRST AMENDMENT CLAIM

Since the *Turner* analysis weighs in favor of the County Defendants' policy prohibiting inmates at the MDC from individually receiving books in the mail, PLN has failed to establish that it is substantially likely to prevail on the merits of its First Amendment claim. Thus, PLN's request for preliminary injunctive relief on this claim will be denied.

### B.   PLN'S FOURTEENTH AMENDMENT DUE PROCESS CLAIM

PLN alleges that the lack of a formal notice and appeal procedure at the MDC for the rejection of books mailed to individual inmates violates PLN's procedural due process rights. Certain minimum procedural safeguards are required when prison officials withhold inmates' access to mail. *Procunier v. Martinez*, 416 U.S. at 417, *overruled on other grounds by Thornburgh*, 490 U.S. 410 (1989). *See also Jones*, 503 F.3d at 1163 (noting that both inmates and publishers have a right to procedural due process). Moreover, publishers have a right to procedural due process when their publications are rejected. *Jacklovich*, 392 F.3d at 433 (citing *Cook*, 238 F.3d at 1152–53 and *Montcalm Publ'g Co.*, 80 F.3d at 109).

At this point in the proceedings, however, the Court finds that PLN has not shown it is likely to succeed on the merits of its due process claim. Although the MDC is considering a new mail policy similar to the sample policy from Mr. Romero, the Court must examine only the MDC's current policies. Since no injunction will issue on the general prohibition of books being sent to individual inmates through the mail, a procedure for individual rejections is unnecessary. However, the Court notes that MDC accepts donated books through its Chaplain. If a donated

book is rejected by the Chaplain, the MDC should provide a process for informing the donor of the reason for the rejection, and the MDC should provide a process for a donor to appeal that rejection. The Court requests that MDC officials work with Mr. Romero, as they are already doing in the *McClendon* case, and develop an acceptable notice and appeal process for entities and individuals who wish to donate books and other reading material to the MDC. *See, e.g., Werholtz*, 2007 WL 2875113, *7–8 (finding that the plaintiff's proposed notification and appeal process, similar to the process used by the Federal Bureau of Prisons, was sufficient under the Fourteenth Amendment).

   IT IS ORDERED that PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT 42 U.S.C. § 1983 AND DAMAGES (Doc. No. 6) is denied.

_____
SENIOR UNITED STATES DISTRICT JUDGE